STEPHEN DAMRILL, Respondent, v. ST. LOUIS & SAN FRANCISCO RAILWAY COMPANY, Appellant.

### St. Louis Court of Appeals, June 14, 1887.

1. NEGLIGENCE, CONTRIBUTORY.—A person who is about to cross a railroad track is bound to look and listen for approaching trains, and his failure to do so debars his recovery, although the railroad company fails to give the proper cautionary signals.

2. SPECIAL FINDINGS — PRACTICE.— If the special findings of a jury show a palpable bias in their minds, the unsuccessful party will be entitled to a reversal of the judgment.

APPEAL from the Greene County Circuit Court, JAMES R. VAUGHAN, Judge.

*Reversed.*

JOHN O'DAY and E. D. KENNA, for the appellant.

LEWIS, P. J., delivered the opinion of the court.

The plaintiff sued, before a justice of the peace, for damages caused by the defendant's engine running over a wagon, team of mules, and set of harness, of the value of one hundred and fifty dollars. In the circuit court, on appeal, it appeared that, at the place where the injury occurred, the railroad and a public highway crossed each other at right angles, the railroad running north and south and the highway east and west. A locomotive and tender were running from north to south, while the plaintiff's wagon, driven by George Ketney, was approaching the track from the east. A few extracts from the testimony will best show how the case was put to the jury.

Ketney testified: "I had been driving in a trot, and when I came close to the railroad, I slacked down to an ordinary walk. * * * As I came down to the

crossing, I looked off from my right hand, and heard no noise. * * * I looked to see if there was any train coming, and did not see any. I listened to hear, and did not hear any. I heard no bell nor whistle rung. There was nothing attached to the engine but a tender. As near as I can now tell, the engine was running like lightning. The first I discovered there was an engine was when I heard the ringing of the track, when I came up to it—by which I mean the ringing sound on the iron. As the mules' feet went onto the track, I looked over my shoulder, and the engine was right onto me—the engine was ten steps away. I instantly pulled back the lines, and pulled the mules to the left, when the engine struck us. * * * It was a bright day, and was not raining. The wind was blowing very hard, from the south to the north. The railroad, at this point, is straight for from a quarter to a half a mile. The farms adjoining it and the wagon-road are prairie farms. I did not, at any time before reaching the crossing, stop still. I changed the gait of the team from a trot to a walk, but did not stop still. After I got upon the railroad, there was nothing to prevent my seeing down the track, in the direction from which the train came, for a quarter of a mile. I was about the length of the mules and wagon east of the track when I looked off to the right, as I stated in my direct examination, and I will swear positively that I quit trotting and looked for the train when I was that distance from the track. I did not at any time stop still."

Jerry Youngblood, who was riding in the wagon with Ketney, testified : " Just as the mule got on the track, the engine ran against him and killed him. * * * I saw the engine first when it was fifty or sixty feet away from us. No whistle was sounded, or bell rung ; or at least I never heard any. After I saw the engine, they gave the whistle two little jerks ; this was about a quarter of a minute or less, before we were struck. The train was running fast. The first I saw of the train was

just as the mules struck the track. Standing on the crossing, one can see a train a quarter of a mile away, as it approaches. From the direction from which this train came, there is a hollow. The track is perfectly straight for from a quarter to a half mile. The wagon-road, as we approach the railroad, slanted down towards the latter. He [Ketney] did not at any time, before going on the crossing, stop the team. * * * There were no houses, or trees, or buildings of any kind, on the north side of the wagon-road. There was some wheat on the north side of the track."

The plaintiff testified: "A man can see an engine on the track one hundred and fifty yards north of the crossing, when he arrives at a point on the wagon-road the same distance east of it. After he arrives within one hundred and fifty yards of the crossing, there is nothing to prevent him seeing one hundred and fifty yards north of it, *until he reaches the crossing.* * * * The first cut is about two hundred yards north of the road-crossing, and between this cut and the railroad-crossing there is a dump or fill. * * * The right of way is one hundred feet wide. It is fenced, and the fence is placed fifty feet on each side of the center of the track at this point. There were no buildings or trees upon the right of way. There was corn growing in the fields on both sides of the right of way."

W. Algood testified: "I was on the wagon-road about forty yards east of the crossing, at the time the plaintiff's team was struck by the train. * * * I stopped my horse when I heard the train, and waited until it struck the team. The engine was then a quarter of a mile north. I stopped as quick as I noticed the train, and it was then a quarter of a mile off."

It is impossible to read this testimony without being strongly impressed by evidences of extreme negligence on the part of the driver of the team. He approached the railroad track from a side where, according to the concurrent statements, he must have been

able to see an engine coming from the north, for a considerable distance, before it reached the crossing. The witness, Algood, traveling over the same road, and from the same direction, discovered the train when it was a quarter of a mile distant. But Ketney made no such discovery until "the mules' feet went onto the track." He says that he looked to see if there was a train coming, but did not see any. He does not say when he first did this, but it is evident that he did not, as a man of ordinary prudence should have done, observe the approaches continuously up to the moment of reaching the track, or at least up to the time when there was only the length of the team and wagon between him and the track. The plaintiff said that a man on the wagon-road one hundred and fifty yards east of the crossing, could see a train on the track when one hundred and fifty yards north of the same point. A "dump," or fill, extended from the crossing to a point one hundred or more yards north, with a corresponding "hollow," in the natural surface on the side next to a traveler approaching from the east. This, of course, must have made the train all the more conspicuous to the traveler so approaching, if he had his eyes about him. Some corn grew in an adjoining field, but nothing said by any witness indicated that this created the least obstruction of view to a person sitting in a wagon on the road. The contrary clearly appears, from the surrounding topographical conformations, as described. A more strongly-marked case of contributory negligence than was here developed in the driver of the team, can hardly be imagined. Our Supreme Court holds, in *Lenix v. Railroad* (76 Mo. 86), that "one who goes upon a railroad track is bound to look and listen for approaching trains ; and if he fails to do so, he can not complain of any injury he may sustain, though the company may be remiss in giving the customary signals." And in *Powell v. Railroad* (76 Mo. 80 ), "In an action grounded upon allegations of negligence, if the undisputed facts show that, notwith-

standing the defendant's negligence, the plaintiff would not have sustained the injuries complained of, but for his own negligence directly tending to produce them, it is the duty of the court to direct the jury to find for the defendant." This doctrine has been so often repeated by our Supreme Court and other authorities, that it is useless to multiply citations. If it be conceded that, as the jury declared in a special finding, the driver's view of the track was obstructed as he approached it, then it was unquestionably his duty, according to the spirit of all the authorities, to stop, and look, and listen, until satisfied that no train was approaching. The rule applies as well where there is any obstruction of sound. *Stepp v. Railroad*, 85 Mo. 229. That he did not do so, was positively sworn to by the driver himself, and by his companion at the time of the accident. No witness testified to the contrary.

There were some very remarkable developments in the special findings of the jury. These are some of the questions put, with the answers given by the jury :

" Did the person in charge of said team stop the same for the purpose of listening for an approaching train ? A. Yes."

The record shows that neither of the occupants of the wagon was contradicted in his positive statement that no such stop occurred, until the mules were on the track.

" Did the person in charge of said team look for an approaching train ? A. Yes."

The only testimony applicable to this question and answer was given by the driver himself, who said: " I was about the length of the mules and wagon east of the track, when I looked off to the right, as I stated in my direct examination, and I will swear, positively, that I quit trotting and looked for the train, when I was that distance from the track."

" Could the person in charge of said team, by the

exertion of reasonable care on his part, have avoided being struck by the train in question? A. No."

So the jury declared, in effect, that for a driver to simply turn his head when within a few feet of the railroad, but without stopping his team, which was still progressing and about to step upon the track, was a prudent and sufficient compliance with the cautionary duties implied in the questions submitted, to justify their answers affirming due performance of those duties. We think that, referring to the testimony alone, the special findings show a palpable bias in the minds of the jury, which should entitle the unsuccessful party to a reversal of the judgment against him. That the court should have sustained the defendant's demurrer to the evidence is clear, at all events.

The judgment of the circuit court is, therefore, reversed. Judge Thompson concurs. Judge Rombauer is absent.